BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, f/k/a Bank of America Illinois, f/k/a Continental Bank N.A., Plaintiff and Counterdefendant-Appellant and Cross-Appellee, v. MICHAEL SCHULSON *et al.*, Defendants and Counterplaintiffs-Appellees and Cross-Appellants.

First District (3rd Division)   No. 1—97—2679

Opinion filed May 26, 1999.—Modified on denial of rehearing June 30, 1999.—Rehearing denied August 9, 1999.

942

Michele Odorizzi, William E. Deitrick, and Marc R. Lisker, all of Mayer, Brown & Platt, of Chicago, for appellant.

Dean A. Dickie, of D'Ancona & Pflaum, of Chicago, for appellee Michael Schulson.

Howard L. Adelman, Henry B. Merens, and Mark A. Carter, all of Adel-

man, Gettleman, Merens, Berish & Carter, Ltd., of Chicago, for appellee Robert Blessing.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:
Plaintiff Bank of America National Trust and Savings Association sued defendants Michael Schulson and Robert Blessing to enforce guaranties defendants made for a loan. The dispute centers around the meaning of a "burn down" clause that reduces the amount guaranteed as principal payments are made "with respect to the liabilities." The bank argues on appeal that the trial court erred in applying the burn down clause to collateral proceeds paid over to the bank in a bankruptcy action almost two years after the guarantors' obligations became due. The trial court interpreted the written guaranties as guaranties for collection. The bank insists they are guaranties for payment. We agree with the bank and reverse.

Defendants have filed a cross-appeal. They challenge attorney fees awarded to the bank without a hearing and the dismissal with prejudice of count II of defendants' counterclaim, which they attempted to voluntarily dismiss. We reverse the trial court on those orders as well.

Defendants formed a limited partnership (Lunan) in 1991 to own, lease, and operate family-style restaurants under franchise agreements with a restaurant chain. Defendant Schulson owned 85% of Lunan and was the president. Defendant Blessing owned 15% and was the vice president and chief operating officer.

Bank of America loaned $13.5 million to Lunan on September 30, 1991. Under the loan and security agreement, the bank was given a security interest in Lunan's assets. The bank also took separate but identically worded personal guaranties from each defendant for up to $3 million each. Section I.A of the guaranties, entitled "Guaranty of Payment," at the heart of this dispute, reads:

"[T]he undersigned hereby unconditionally guarantee(s) the full and prompt payment when due, whether by acceleration or otherwise, and at all times thereafter, of all obligations of the Debtor to the Bank, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or now or hereafter existing, or due or to become due (all such obligations, together with any extensions or renewals thereof, being hereinafter collectively called the 'Liabilities'), and the undersigned further agree(s) to pay all expenses, including, without limitation, attorneys' and legal assistants' fees (which attorneys and legal assistants may be employees of the Bank) and legal expenses, paid or incurred by the Bank in endeavoring to collect the Liabilities, or any part thereof, and in enforcing this guaranty. The right of recovery against the undersigned under this guaranty is, however,

limited to the payment of the amount of $3,000,000.00 (or such lower amount as may be determined pursuant to *Section 1.2* of this Guaranty), plus (a) interest on such amount and (b) all expense of enforcing this guaranty." (Emphasis in original.)

The parties agree that the reference to section 1.2 was intended as a reference to section I.B. Section I.B. contains the burn down clause, which reads:

"The amount of this Guaranty shall be reduced by an amount equal to 36% of any principal payments made with respect to the Liabilities, but only to the extent that the amount of any such principal payments are not subsequently reborrowed by Debtor."

By the end of 1993 Lunan had defaulted on its obligations. On March 30, 1994, the bank and Lunan entered into an amended and restated loan and security agreement. In May 1994, the bank was paid $18,300 from the sale of Lunan equipment. That amount was credited by the bank against unpaid principal in accord with the burn down clause. The parties do not dispute that defendants' guaranties were properly reduced by 36% of the $18,300.

Lunan filed a voluntary petition for bankruptcy later that year—on October 25, 1994. The parties agree that the filing of this petition was an "event of default" under the loan and security agreement and that obligations under the guaranties were then triggered. On November 10, 1994, the bank sent each defendant a notice of default and demanded payment under the guaranties in the amount of $2,993,412 in principal, plus $72,509.73 in interest.

Bankruptcy proceedings went forward, and Lunan's collateral was eventually sold. In September 1996, the bankruptcy judge ordered $8,043,227.21 of the collateral collections from the sale of Lunan assets to be applied toward the unpaid principal of Lunan's loan.

Meanwhile, the bank filed separate suits against defendants Schulson and Blessing on December 15, 1994, seeking payment under the guaranties. The two cases were later consolidated. Defendants each filed a two-count counterclaim. Count I sought a declaration that defendants were entitled to a reduction of their guaranty obligations in the amount of 36% of the bankruptcy collateral collections paid to the bank. Count II alleged breach of express contractual conditions and an implied covenant of good faith and fair dealing of the guaranties.

The bank moved for summary judgment, arguing that the burn down clause applied only to principal payments made before the guarantors' obligations became due on November 10, 1994. In ruling on the bank's motion for summary judgment, the trial judge first concluded that the burn down clause is ambiguous. The judge then

reviewed the negotiating history, which includes several drafts of the guaranties. The judge concluded that the parties intended the burn down provision to apply to principal payments made at "any" time, including the bankruptcy collateral proceeds collected after Lunan's default. The bank's motion for summary judgment was denied.

After deciding that the 36% discount applied to principal payments made after Lunan filed bankruptcy, the trial court invited defendants to file their own motion to dispose of the case. Defendants then filed a "motion for entry of order in accordance with ruling." The judge granted partial summary judgment for defendants. Judgment was entered for the bank in the amount of $97,850.20 plus interest for each guaranty, and for attorney fees in the amount of $320,022.35. Defendants' counterclaims were dismissed with prejudice.

The bank argues on appeal that the court erroneously read the guaranties as guaranties of collection. The bank asserts that the guaranties are unambiguous guaranties of payment that entitle the bank to prompt payment upon the debtor's default, notwithstanding the burn down clause. The bank alternatively argues that the trial court erred in not granting a trial on the proper interpretation of the burn down clause and that, even if the reduction formula applies to collateral proceeds, the court erred in relying on the bankruptcy court's distributions. Because we agree with the bank's first argument, we do not address the alternative arguments.

■ We review summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986).

■ A guarantor's liability is determined from the guaranty contract, which is interpreted under general principles of contract construction. *Cohen v. Continental Illinois National Bank & Trust Co.*, 248 Ill. App. 3d 188, 192, 618 N.E.2d 1060 (1993), citing *Du Quoin State Bank v. Daulby*, 115 Ill. App. 3d 183, 185, 450 N.E.2d 347 (1983). An unambiguous contract must be enforced as written. *Cohen*, 248 Ill. App. 3d at 192. Where the only dispute concerns the meaning of a contract provision, we must first address the threshold issue of whether the contract is ambiguous. *Ford v. Dovenmuehle Mortgage, Inc.*, 273 Ill. App. 3d 240, 244, 651 N.E.2d 751 (1995). Whether a contract is ambiguous is a question of law. *Groshek v. Frainey*, 274 Ill. App. 3d 566, 569, 654 N.E.2d 467 (1995).

■ A contract is ambiguous if it is susceptible to more than one

reasonable interpretation. *Ford*, 273 Ill. App. 3d at 244. In determining whether a contract is ambiguous, a court must construe the contract as a whole, reading each term in light of the others. *Ford*, 273 Ill. App. 3d at 244. It is presumed that each part of a contract was inserted deliberately and for a purpose consistent with the overall intention of the parties. *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 283, 154 N.E.2d 683 (1958). If possible, we must interpret a contract in a manner that gives effect to all its provisions. *Martindell*, 15 Ill. 2d at 283; *Srivastava v. Russell's Barbeque, Inc.*, 168 Ill. App. 3d 726, 731, 523 N.E.2d 30 (1988).

■ Defendants point out that when doubts arise from the contract language a guarantor will receive the benefit of that doubt and the contract will be construed in his favor. See *Cohen*, 248 Ill. App. 3d at 192. But a guarantor is only entitled to this benefit where "doubts arise." Where the guaranty is not ambiguous, it must be construed according to its terms. *Citicorp Savings v. Ascher*, 196 Ill. App. 3d 570, 574, 559 N.E.2d 409 (1990). *Cf. Harbor Insurance Co. v. Continental Illinois Corp.*, 922 F.2d 357, 366 (7th Cir. 1990) (Illinois contract construction principle favoring "insured" applies only if, after considering the contract and evidence, the contract remains ambiguous).

■ The bank argues that the trial court's interpretation of the contract transforms what was clearly intended to be a guaranty of payment into a guaranty of collection. Guaranties of payment require the payment of a debt immediately when due if the debtor fails to pay. Guaranties of collection, on the other hand, require payment only after the lender first uses all legal means to collect payment from the debtor. *Beebe v. Kirkpatrick*, 321 Ill. 612, 616, 152 N.E. 539 (1926).

Defendants first argued in their answer to the bank's complaint that the guaranties are guaranties of collection. Defendants maintained that the bank's suits, brought before the Lunan assets were completely liquidated, were premature. Defendants have abandoned this argument and now admit that the bank was not required to first attempt to collect from the primary debtor or its collateral. But defendants argue that regardless of the label used to describe the guaranties, they are entitled to the benefit of the burn down clause on principal payments made at any time. Since the bank received a payment from the collateral proceeds, defendants maintain they are entitled to a reduction in their guaranty obligation based on that payment.

The parties both attempt to draw support for their interpretation from the words: "any principal payments made with respect to the liabilities." The bank emphasizes that the word "made" is in the past tense, and so the burn down clause does not apply to payments that

remain "to be made" when defendants' obligations are due. Elsewhere in the guaranties the possibility of future actions is addressed with language that refers to "obligations of the Debtor *** due or *to become due*." (Emphasis added.)

Defendants, on the other hand, stress the word "any." Defendants argue that the word "any" suggests that there are no time limitations. Defendants also stress the word "liabilities." Defendants point out that the definition of "liabilities" in the guaranties includes all of the debtor's obligations to the bank, including accelerated obligations. Defendants argue that since the definition of "liabilities" includes accelerated obligations, the burn down clause must be read to apply the discount to payments made on accelerated obligations.

Defendants rely on *Affronti v. Bodine*, 155 Ill. App. 3d 755, 508 N.E.2d 500 (1987). In *Affronti*, the borrower sought a declaration that his mortgage should be released under a clause that stated: "This mortgage is to be released *at any such time* as the unpaid principal balance of the Note is reduced to [$132,200.00]." (Emphasis added.) *Affronti*, 155 Ill. App. 3d at 756. The borrower made a payment reducing the amount owed to $132,200 on the date the trial was to begin. We held that under the clear language of the mortgage, there were no time limitations in the release clause, so the payment operated to release the mortgage.

We do not find *Affronti* helpful in analyzing the guaranties here. The agreement in *Affronti* made clear that the mortgage would be released "at any such *time*" payment was made. (Emphasis added.) 155 Ill. App. 3d at 756. The guaranties here did not clearly articulate that the time for the reduction was unlimited. More important, the clause that allowed for an open-ended time frame in *Affronti* did not contradict other language in the contract. We cannot consider the burn down clause in isolation. We must consider it in light of the other contract terms. *Ford*, 273 Ill. App. 3d at 244.

We note that the word "any" may be limited when other language cannot be given effect without the limitation. *Mayfair Construction Co. v. Waveland Associates Phase I Ltd. Partnership*, 249 Ill. App. 3d 188, 201, 619 N.E.2d 144 (1993), involved a contract clause that stated: "[a]ny dispute between [the parties] may be litigated in [court]." The *Mayfair* defendant argued that the clause applied notwithstanding other contract terms that required disputes "shall be referred initially to the architect for decision." *Mayfair*, 249 Ill. App. 3d at 200. We declined to adopt an interpretation that would have rendered the architect-review requirement meaningless. We also disagreed with the defendant that the contract was ambiguous. Instead, we interpreted the clauses to mean that, once the prerequisite of submitting the

dispute to the architect had been satisfied, the parties were free to litigate the dispute in court. *Mayfair*, 249 Ill. App. 3d at 201.

The bank argues that several clauses in the guaranties would be ineffective if the burn down clause applied to payments made after defendants' obligations became due. The bank points out that it is entitled to "full and prompt payment" under section I, or payment within 15 days of a written demand after the debtor's insolvency under section II. The parties disagree about whether the guaranties were properly accelerated under section II, but the factual dispute does not trump defendants' admission that their obligations were automatically triggered under the language of section I when Lunan defaulted. Whether defendants' obligations were triggered under section I upon Lunan's default (October 25, 1994), or under section II upon written demand (November 10, 1994), the trigger predated distribution of the collateral proceeds by almost two years. Under defendants' interpretation, the due date would, in effect, be extended for that time because the amount owed could not be calculated before September 1996, when the bank received payments from collateral collections in bankruptcy. The trigger dates under either section I or II would be nullified.

The bank also maintains that the language giving the bank an absolute and unconditional guaranty would be nullified under defendants' reading. The guaranties repeatedly describe the guaranties as "absolute" and "unconditional." When a guaranty is "absolute and unconditional," the guaranteed party is not required to complete a foreclosure on the debtor's security before seeking payment under the guaranty. *Northern Trust v. VIII S. Michigan Associates*, 276 Ill. App. 3d 355, 369-70, 657 N.E.2d 1095 (1995); *Lawndale Steel Co. v. Appel*, 98 Ill. App. 3d 167, 170, 423 N.E.2d 957 (1981). In addition to the words "absolute" and "unconditional," section VI allows the bank to "resort to the undersigned *** for payment of any of the Liabilities, whether or not the Bank *** shall have resorted to any property securing any of the liabilities or any obligation thereunder."

We find *Telegraph Savings & Loan Ass'n v. Guaranty Bank & Trust Co.*, 67 Ill. App. 3d 790, 385 N.E.2d 97 (1978), instructive. Neither party cites to this case, but the facts are very close to those before us. *Telegraph* involved a guaranty under which the guarantors' $35,000 obligation would end once the principal was reduced to $40,000. When the primary debtor defaulted, the bank simultaneously sought to foreclose on property and to collect under the guaranty. After the property was sold, a deficiency of $21,853.60 remained. The trial court ruled that the bank was no longer entitled to recover under the guaranty since the amount owing on the loan was less than

$40,000. We reversed. We noted that the guarantors promised to "promptly and punctually perform each of the covenants, agreements, and conditions of the note, and to promptly pay the first $35,000 of the principal in the manner and in accordance with the terms of the note and trust deed." *Telegraph*, 67 Ill. App. 3d at 796. Under the terms of the guaranty, the guarantors immediately became debtors upon default. *Telegraph*, 67 Ill. App. 3d at 796, citing *National Bank v. First Wisconsin National Bank*, 53 Ill. App. 3d 482, 487, 368 N.E.2d 119 (1977). We held:

> "If we adopt the guarantors' contention, the terms 'prompt and punctual' become meaningless. It would always be to the guarantors' advantage not to make payments upon default but to wait until the foreclosure sale. Applying the foreclosure sale proceeds as payments on the loan would render the guaranty taken as additional security illusory and meaningless." *Telegraph*, 67 Ill. App. 3d at 796.

We concluded that the parties intended that only voluntary payments in the amount of $40,000 would release the guarantors from their obligations.

Defendants do not explain how payments made from the sale of secured property qualify as "principal payments" under the burn down clause. In *Telegraph*, we declined to consider foreclosure sale proceeds as "payments on the loan" where doing so would have rendered the guaranty illusory. *Telegraph*, 67 Ill. App. 3d at 796. Similarly, we do not believe the collateral proceeds here are "principal payments."

Like the guarantor in *Telegraph*, the guarantors here became debtors immediately upon the primary debtor's default. And, like the guarantors in *Telegraph*, the guarantors here promised "full and prompt payment" when the primary debtor's obligations became due. Under defendants' reading of the guaranties, the bank is no longer entitled to prompt payment, or to recover under the guaranties, whether or not it resorts to the collateral. Defendants' reading of the burn down clause would compel the bank to wait until the primary debtor's collateral is sold because the amount the guarantors owed could not be calculated until then.

Defendants also argue that the burn down clause takes precedence over the rest of the contract because "added language prevails over the boilerplate language of a printed form." See *In re Kevin W. Emerick Farms, Inc.*, 201 B.R. 790, 801 (C.D. Ill. 1996). Defendants compare this case to *Brzozowski v. Northern Trust Co.*, 248 Ill. App. 3d 95, 618 N.E.2d 405 (1993). In *Brzozowski*, the court construed a guaranty that had a printed clause providing for unconditional, absolute liability for

the entire indebtedness, and a typed provision that limited the right of recovery to $38,100. We noted that the two contract provisions were in direct conflict. We held that "where an ambiguity exists between a typed provision and the printed form, then the typed provision is to be given effect over the printed provision." *Brzozowski*, 248 Ill. App. 3d at 99.

The result in *Brzozowski* stemmed, not from the inapplicability of "boilerplate" language, but from the addition of a typed provision that did not match a provision on the printed form. Here the guaranties were not printed forms—the entire documents were typed. Further, the contested contract language is not in direct conflict with what the trial court chose to characterize as "boilerplate" provisions, but can be harmonized with them.

Defendants also argue that where a contract contains general and specific terms, the specific terms control. See *Continental Casualty Co. v. Polk Brothers, Inc.*, 120 Ill. App. 3d 395, 45 N.E.2d 1271 (1983); *American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 274 Ill. App. 3d 327, 653 N.E.2d 1357 (1995). Defendants ask us to place the burn down clause in the "specific" category while those in the "general" category would include the guaranty of prompt payment, the unconditional and absolute language of the guaranty, and the right to resort to the guaranties without first seeking payment from the debtor or the collateral. We decline to characterize this language, which outlines defendants' obligations and the bank's remedies in detail, as "general." Even if the language were "general," defendants cite no case that holds "specific" clauses trump "general" clauses where the two can be read as consistent. Such a rule could not coexist with the contract principle that directs us, if possible, to interpret a contract in a way that gives effect to all its terms. *Srivastava*, 168 Ill. App. 3d at 731.

■ We find only one reasonable interpretation that gives meaning and weight to all the guaranties' provisions—the one the bank suggests. Defendants' obligations are triggered upon the debtor's default. The bank is then entitled to prompt payment, so the amount owing must be calculable at that point. The burn down applies only to principal payments that have been made at that time.

Our analysis so far has been limited to the four corners of the guaranties. We must now address defendants' argument that we should "provisionally" consider parol evidence to determine whether the contract is ambiguous. We note that the trial court ruling did not appear to rely on parol evidence in finding the contract ambiguous. But we recognize there is authority for the proposition that, in some circumstances, parol evidence may be provisionally considered to

determine if an agreement that appears to be clear on its face is ambiguous. *Ahsan v. Eagle, Inc.*, 287 Ill. App. 3d 788, 790, 678 N.E.2d 12 (1997). Defendants rely on evidence of the parties' negotiations to show the burn down clause is ambiguous.

The parties exchanged three drafts of a preliminary term sheet, four drafts of a commitment letter, and five drafts of the guaranties before signatures were affixed. The five drafts of the guaranties show how the parties modified the language of the burn down clause from draft to draft. The first draft read:

> "During the Repayment Period, the amount of this Guaranty shall be reduced by an amount equal to 36% of the amount of each of the scheduled principal payments made under the Loan Agreement; *provided, however*, that the amount of the Guaranty shall not be reduced under this *Section 1.2* if there exists and is continuing an Event of Default or an Unmatured Event of Default, or any Guarantor is in default under any Guaranty, the Loan Agreement or any Related Agreement." (Emphasis in original.)

The second draft omitted the language that the reduction would not apply in the event of a default. The third draft deleted the words "each of the scheduled principal payments made under the Loan Agreement" and replaced them with "any principal payments made with respect to the Liabilities." The fourth draft did not include the requirement that the principal payments be made "[d]uring the Repayment period." This draft also added the qualification that the reduction would not apply to amounts reborrowed.

Defendants also note deposition testimony as further evidence of a contract ambiguity. Defendants maintain that, according to the depositions, the parties and bank representatives disagreed about when defendants' obligations became due and how the burn down clause would operate.

We disagree that provisional consideration of parol evidence is proper here where the alternative interpretation defendants suggest would change unambiguous contract terms. The provisional consideration approach may only be used to clarify the definition of terms in determining whether the contract is ambiguous. *Meyer v. Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 889, 652 N.E.2d 1233 (1995). We acknowledge that the negotiations in this case support an inference favorable to defendants that limitations on the burn down clause were under discussion. But we find nothing ambiguous about the guaranties' terms in the signed document requiring prompt payment, or allowing the bank to collect from the guarantors whether or not it first seeks payment from the debtor or collateral. And where contract terms are clear and unambiguous, parol evidence may not be considered to

vary the meaning of those terms. See *Hubble v. O'Connor*, 291 Ill. App. 3d 974, 981, 684 N.E.2d 816 (1997). Nothing about the practice of provisional consideration detracts from this rule. See *Rybicki v. Anesthesia & Analgesia Associates, Ltd.*, 246 Ill. App. 3d 290, 299, 615 N.E.2d 1236 (1993), citing 17 Am. Jur. 2d *Contracts* § 403, at 429-30 (1991).

The bank's interpretation of the guaranties—and the one we adopt—is the only one that gives effect to all the contract terms. We find the guaranties unambiguous and hold that the bank was entitled to judgment as a matter of law. We affirm judgment for the bank, but reverse the partial summary judgment for defendants and remand for recalculation of the amount owed under the guaranties. We direct the trial court to consider only principal payments made before Lunan filed bankruptcy in calculating the offset to which defendants are entitled.

We turn to the issues raised in defendants' cross-appeal. Defendants first argue that the trial court erred in awarding attorney fees in the amount of $296,367.05 (the amount the bank sought minus docket clerk fees and fees paid to an attorney who appeared as a witness). The court ruled that defendants were jointly and severally liable for the fees. Defendants argue that the fees should not have been awarded without an evidentiary hearing and that the award should not have been joint and several.

The bank responds that attorney fees may be awarded without an evidentiary hearing when affidavits and detailed billing sheets are submitted to the trial court. The bank relies on *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 494, 672 N.E.2d 1136 (1996). *Raintree* is not on point. In *Raintree*, our supreme court reviewed attorney fees awarded by an administrative law judge for the Human Rights Commission. The court acknowledged that, under some circumstances, attorney fees may be calculated without an evidentiary hearing. But the issue in *Raintree* was governed by the Commission's rules, which did not require an evidentiary hearing. *Raintree*, 173 Ill. 2d at 494.

Defendants presented detailed objections to the fee petition and a written request for a hearing. The reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue. *Fried v. Barad*, 187 Ill. App. 3d 1024, 1030, 543 N.E.2d 101 (1989); *6334 North Sheridan Condominium Ass'n v. Ruehle*, 157 Ill. App. 3d 829, 834, 510 N.E.2d 975 (1987). When a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one. *In re Support of Burks*, 100 Ill. App. 3d 700, 706, 427 N.E.2d 953 (1981); *People ex rel. Holland v. DeMichael*, 79 Ill. App. 3d 974, 981, 398 N.E.2d 1138 (1979).

■ Defendants also argue that the trial court should not have imposed "joint and several" liability on the defendants for payment of attorney fees. Because the issue may arise again on remand, we address it here. The guaranties require that defendants pay "all expense of enforcing this guaranty." The bank contends that "virtually all of the *** fees were incurred in the course of the consolidated proceeding." Even before the cases were consolidated, the pleadings and motions filed in the separate cases were virtually identical. The bank alleges that if it had sued only one of the guarantors, the fees would have been the same. The bank argues that one guarantor should not "gain a windfall" because the bank sued both.

Defendants respond that a guarantor "is bound only to the extent and in the manner and under the circumstances pointed out in his obligation." *Citicorp Savings v. Ascher*, 196 Ill. App. 3d 570, 574, 554 N.E.2d 409, 411 (1990). Defendants argue that since the guaranties do not provide for joint and several liability, each defendant is only obligated to pay the expense of enforcing his guaranty.

The guaranties did not provide for joint and several liability, but they did provide that each guarantor would pay "all expense of enforcing this guaranty." Since the bank's attorneys wrote the same motions and conducted the same discovery for both cases, the fees would have been incurred in each case, whether one or both defendants were sued. See *Phillips Nizer Benjamin Krim & Ballon LLP v. Chu*, 240 A.D. 231, 232, 659 N.Y.S.2d 4, 4-5 (1997) (court properly found defendants jointly and severally liable for attorney fees where case against each involved same research and discovery). If defendants were each responsible for only half of the total, they would be relieved of their contractual obligation to pay "all expense" of enforcing the guaranty. Both defendants, therefore, are responsible for all fees if it is established to the satisfaction of the trial court that the work done was the same for both cases. We note, however, that while each defendant may be liable for the full amount, the bank may collect the full amount only once. We also note that defendants remain free to present evidence at an evidentiary hearing to show that some attorney fees were generated in one case but not the other.

■ Defendants also challenge the trial court's *sua sponte* dismissal with prejudice of count II of their counterclaims. When the trial court made this ruling, a voluntary motion to dismiss was pending. Defendants argue that they had a right to voluntarily dismiss the counterclaim under section 2—1009(a) of the Code of Civil Procedure. 735 ILCS 5/2—1009(a) (West 1996). Count II alleged that the bank's willful refusal to honor the burn down clause was a breach of contract and an implied covenant of good faith and fair dealing.

A party has a right to voluntarily dismiss a suit before a trial or hearing, unless there is a potentially dispositive motion before the court. *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 66, 566 N.E.2d 1283 (1990); *Gibellina v. Handley*, 127 Ill. 2d 122, 138, 535 N.E.2d 858 (1989). The trial court's dismissal of count II with prejudice was not made in response to a pending motion. The bank's original motion for summary judgment had been denied and defendants' motion for summary judgment did not address the counterclaims. We have found no authority that allows a judge to *sua sponte* dismiss a claim with prejudice in response to a motion to voluntarily dismiss under section 2—1009. We therefore reverse the trial court's dismissal with prejudice of count II of the counterclaim.

In a petition for rehearing, defendants raised an issue lurking in the cross-appeal they filed in this case: inferences arising from the bank's alleged forgery of a key document that would have precluded judgment for the bank as a matter of law. While we disagree with defendants' assertion that they raised the issue in their cross-appeal (a footnote and a passing reference to discovery pending at the time the trial court entered judgment can hardly be called raising an issue), the issue is, in fact, alive and well, based on our ruling that the trial court was wrong to dismiss count II of the defendants' counterclaim with prejudice. We have held that defendants were entitled to voluntarily dismiss count II, containing allegations that the bank breached expressed and implied covenants of good faith and fair dealing. This preserves the right of defendants to revive the issue of alleged forgery if they choose.

We affirm judgment for the bank, but in an amount to be calculated by the trial court consistent with this opinion. We reverse the partial summary judgment for defendants. We also reverse the trial court's award of attorney fees and the dismissal of count II of defendants' counterclaim with prejudice. On remand we direct the trial court to recalculate the amount owing under the guaranties in a manner consistent with this opinion; to conduct an evidentiary hearing on attorney fees; and to grant defendants' voluntary dismissal on count II of their counterclaims.

Affirmed in part and reversed in part; cause remanded.

COUSINS and McBRIDE, JJ., concur.